Argued March 8, affirmed November 1, 1977

STATE OF OREGON, *Respondent,*
*v.*
ARMANDO ZAMORA FLORES,
*Petitioner.*
(C 75-11-3586 Cr, SC 25024, CA 6124)
570 P2d 965

J. Marvin Kuhn, Deputy Public Defender, Salem, argued the cause for petitioner. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

W. Michael Gillette, Solicitor General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson,** Attorney General, and John W. Burgess, Assistant Attorney General, Salem.

BRYSON, J.

Linde, J., dissenting, joined by Denecke, Chief Justice, and Lent, Justice.

---

** Attorney General at the time the brief was filed.

**BRYSON, J.**

On November 6, 1975, defendant was arrested on an assault charge. The police took defendant to the police station and informed him of his rights as follows:

> "I advised him he had the right to remain silent, that anything he said would be used against him in a court of law; he had a right to have a lawyer and have him present while he was being questioned, and if he could not afford to hire one, the Court would appoint one to him at no expense to himself."

The police informed defendant of his rights in English. Defendant speaks some English, but his primary language is Spanish. However, when an officer asked defendant in Spanish whether he understood his rights, defendant answered that he did and signed the form.

Defendant chose not to exercise his *Miranda* rights and was interrogated for approximately four hours. At some time during the questioning defendant became a suspect in a murder case, which is the subject of the present appeal.

Defendant had two keys in his possession when he was arrested. The police asked about them and defendant said they were keys for lockers at the Greyhound Bus Depot. An officer asked defendant (in Spanish) for permission to search the lockers. He did not inform defendant that he need not consent. Defendant consented. The police searched the lockers and discovered property missing from the murder victim's home.

The police continued to question defendant. When defendant asked for an attorney, the police stopped questioning him. However, defendant then asked, "What happens now?" An officer told him in Spanish that he would be charged with murder and outlined the evidence against him. During this conversation, defendant admitted killing the victim. After again being advised of his rights, defendant confessed to killing the victim in self-defense.

At the pretrial hearing, the trial court made the following findings:

"* * * * *.

"3. The Defendant was fully and properly advised of all his Constitutional rights in both English and Spanish.

"4. The Defendant fully understood his rights.

"5. After being fully advised, the Defendant did make statements freely and voluntarily and did consent to a search of the bus lockers under his control.

"6. All statements made by the Defendant were freely and voluntarily made and were not the product of any threats, promises or coercion of any nature whatsoever.

"7. After making numerous statements, the Defendant did request an attorney, at which time the questioning was terminated.

"8. After termination of questioning, the Defendant did enter into conversation with an officer and did voluntarily assert that he had committed the homicide in question.

"9. The admission regarding the homicide was not the result of interrogation but was a decision of the Defendant."

The court therefore refused to suppress the confession or the items taken from the lockers. After trial on defendant's plea of not guilty, the jury returned a verdict of guilty of murder and robbery. Judgment was entered on the verdict. The Court of Appeals affirmed without opinion, 27 Or App 428, 556 P2d 1391 (1976).

■ Defendant filed a petition for review, contending that his consent to the search was invalid because he had not been informed by the police that he could refuse consent. His argument was based on *State v. Williams,* 248 Or 85, 432 P2d 679 (1967), and *State v. Douglas,* 260 Or 60, 488 P2d 1366 (1971).

In *State v. Williams, supra,* a case factually similar to the case at bar, a majority of this court held that the evidence seized as a result of a search with the defendant's consent was not admissible because the defendant was not advised of his rights. But in that

[ 276 ]

case the decision was based on the Fifth Amendment of the Federal Constitution when the U. S. Supreme Court had not ruled on the question now before us. It was not based on Article 1, Sec. 9, of the Oregon Constitution. In *State v. Douglas, supra,* a majority of this court held that under the facts of that case "the police officers were under no duty to affirmatively inform defendant of his constitutional right to refuse consent to a search of his suitcase before asking if he would consent to an examination of its contents. To hold otherwise would, in our view, emphasize form over substance and permit the making of a 'game' out of the use of Fourth Amendment rights by defendants who have admitted knowledge of such rights." (260 Or at 73-74). Again, that opinion was prior to the U. S. Supreme Court ruling on the question and was not based on Article 1, Sec. 9, of the Oregon Constitution.

We granted review and in the letter stating the questions for review noted that *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976), held not only that a defendant in custody need not be told of his right to refuse consent to search, but also that the fact that a defendant in custody, not aware of his right to refuse consent, is not to be given controlling significance. We also raised *sua sponte* the question whether this court ought to look to the Oregon Constitution in reviewing the apparent conflict between *State v. Williams, supra,* and *United States v. Watson, supra.* If so, we further asked whether we should adhere to our decision in *State v. Williams, supra,* or whether we should interpret the Oregon Constitution so as to agree with the result in *United States v. Watson, supra.*

We first observe that the interpretation given the Fourth Amendment to the United States Constitution in *United States v. Watson, supra,* and in *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973), constrains us to hold that defendant's federal constitutional rights were not violated in this case. *Schneckloth* held:

[ 277 ]

"*  *  * [T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. *  *  *" 412 US at 227.

*Schneckloth* expressly reserved the question of whether the same result applied to custodial arrests. *Watson* held that the same result did apply (423 US at 424).

In the case at bar, the police used no force or threat of force, made no promises, and used no other forms of coercion in obtaining defendant's consent to the search.[1]

Despite this apparent absence of coercion, defendant claims that his consent was not his own "essentially free and unconstrained choice" because his will had been "overborne and his capacity for self-determination critically impaired," *Schneckloth v. Bustamonte, supra* at 225, because of the following factors: (1) he had been arrested; (2) there was no proof that he knew he could withhold his consent; and (3) he had been taken to the police station. However, *United States v. Watson, supra,* holds that the first two factors are not dispositive. The only difference between this case and *Watson* is that the defendant in that case had not been taken to the police station. The question, then, based on the U. S. Supreme Court's analysis in *Watson,* is whether that court would hold that the suspect's being taken to the police station was "to be given controlling significance" (423 US at 424) so as to require proof of his knowledge that he could withhold consent. We are of the opinion that it would not.

---

[1]Indeed, the *Miranda* warning, informing defendant of his right to remain silent, would have served to some extent to inform defendant that he need not answer the police request to search the lockers and, in fact, would have indicated to him that he need not respond to the initial questions about what the keys were for.

Defendant had been properly arrested, had been informed of his *Miranda* rights, and had not been subjected to any coercion. Under these circumstances, we believe that his being in the police station is not controlling but is merely another factor in determining voluntariness.

■■ After arguments by the parties on both the Federal and Oregon Constitutions, we are now of the opinion that we should consider the Oregon Constitution in order to make a final ruling on this issue, although the defendant failed to invoke Article 1, Sec. 9, of the Oregon Constitution in the trial court, on appeal to the Court of Appeals, and in his petition for review. Although the general rule precluding appellate review of questions not raised in the trial court applies to constitutional questions, *see The Alpha Corp. v. Multnomah Co.,* 182 Or 671, 680, 189 P2d 988 (1948), we have adopted a rule of flexibility in cases involving an individual's liberty. *State v. O'Neill,* 274 Or 59, 65, 545 P2d 97 (1976). Where, as here, the record is sufficient to make the constitutional determination, we will do so.

■ Although we are bound by the United States Supreme Court's interpretation of the Federal Constitution, we are at liberty to adopt a stricter test under our own constitution. *Oregon v. Hass,* 420 US 714, 719, 95 S Ct 1215, 43 L Ed 2d 570 (1975); *State v. Evans,* 258 Or 437, 442, 483 P2d 1300 (1971). However, we see no persuasive reason to do so.

■ *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan L Rev 297, 318-19 (1977), suggests four criteria that state courts should consider in engaging in an independent interpretation of their own state constitutions. They are: (1) the similarity of the state and federal provisions; (2) relevant state precedents; (3) unique local conditions; and (4) the position taken by the United States Supreme Court. To these considerations we would add a fifth—the need for a uniform standard in the area of

[ 279 ]

law under discussion. *State v. Florance,* 270 Or 169, 183, 527 P2d 1202 (1974).

Oregon constitutional provisions are similar. Article I, Sec. 9, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These provisions differ only in that the Oregon Constitution uses the active voice and refers to search *or* seizure rather than searches *and* seizures.[2] There is no indication that the drafters of our constitution intended Article I, Sec. 9, to be different from the Fourth Amendment. *See generally,* Carey, A History of the Oregon Constitution (1926). In addition, although early Oregon cases construed Article I, Sec. 9, without reference to the Federal Constitution,[3] we have more recently stated that the scope of both provisions is similar.[4] From the above, we conclude that there is no reason, based on either the text or the history of

---

[2] *State v. Elkins,* 245 Or 279, 286, 422 P2d 250 (1966), relied on the use of the word "or" in our constitution as demonstrating the framers' intent to apply the reasonableness test to both searches and seizures. However, the federal provision has also been interpreted disjunctively. *See, e.g., Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1913); *United States v. Jeffers,* 342 US 48, 72 S Ct 93, 96 L Ed 59 (1951).

[3] *See, e.g., State v. Rosser,* 162 Or 293, 349, 86 P2d 441, 87 P2d 783, 91 P2d 295 (1939); *State v. Christensen,* 151 Or 529, 531, 51 P2d 835 (1935); *State v. Walker,* 135 Or 680, 683, 296 P 850 (1931); *but cf. State v. Lee,* 120 Or 643, 647-49, 253 P 533 (1927).

[4] *State v. Elkins,* 245 Or 279, 282, 422 P2d 250 (1966).

Article I, Sec. 9, to suppose that that section has a different meaning from the Fourth Amendment.

The only state precedents for defendant's position are *State v. Williams, supra,* and *State v. Douglas, supra.* However, those cases were specifically based on the federal, not the state, constitution and so are not authority for defendant's interpretation of the Oregon Constitution. We are not aware of any unique local conditions, such as widespread police misconduct infringing suspects' rights against unreasonable searches and seizures, that would require a different rule under the state constitution. And, of course, the United States Supreme Court decision, *United States v. Watson, supra,* is contrary to defendant's position and is not an old decision indirectly relevant to this case. Rather, it is quite recent and on point.

Further, the fifth consideration—the need for a uniform standard—is also against defendant's interpretation. In *State v. Florance, supra,* and *State v. Evans, supra,* we noted that to promote effective law enforcement, particularly when state and federal law enforcement agencies collaborate, and to further the orderly administration of criminal trials, there ought to be a uniform rule. We see no need to re-examine the position we took in those cases.

Finally, on the merits, we note that to adopt a rule requiring proof that a criminal suspect was aware of his right to refuse consent would be tantamount to requiring a police warning similar to the *Miranda* warning. As to such a result, we agree with the dissenting opinion of Justice Holman in *State v. Williams, supra:*

> "The rules of *Escobedo* and *Miranda* were promulgated by the United States Supreme Court as prophylactic measures for the purpose of preventing police from exercising physical and psychological pressures upon persons in custody to obtain admissions and confessions. While this court had not theretofore seen sufficient evidence of such abuses in this state to merit such

prophylactic rules, this court was bound by the necessarily uniform application of the Supreme Court's interpretation of the Fifth Amendment to the United States Constitution.

"The majority of this court now apply *Escobedo* and *Miranda* rules to searches and seizures. The application of such rules to searches and seizures can only be justified on the basis that there is the same necessity for prophylaxis because of similar abuses by the police in obtaining consents to searches and seizures. The United States Supreme Court has not yet determined that there are such abuses on a national scale and I know of no evidence which presently justifies such a determination in Oregon." 248 Or at 94-95.

For this reason, and because of the "one rule" policy of *Florance* and *Evans*, we decline to interpret Article I, Sec. 9, of the Oregon Constitution more strictly than the United States Supreme Court interpreted the Fourth Amendment in *United States v. Watson, supra.*[5]

Affirmed.

**LINDE, J.,** dissenting.

The majority recognizes, as it must, that this court has responsibility for the guarantees of individual liberty provided in Oregon's Bill of Rights, article I of the Oregon Constitution. That recognition means much, even if the court divides on the outcome of the present case. It is elementary that determination of Oregon law is antecedent to any claim under the federal fourteenth amendment, since a state does not

---

[5] Although the decisions of other state courts are not of great relevance in interpreting our constitution, it may be noted that on this issue the following states have refused to interpret their constitutions more restrictively than the United States Supreme Court interprets the Fourth Amendment. *State v. Knaubert,* 27 Ariz App 53, 550 P2d 1095, 1099 (1976); *People v. Reed,* 393 Mich 342, 224 NW2d 867, 876-77 (1975); *State v. Berry,* 526 SW2d 92, 98 (Mo App 1975); and *State v. Rocheleau,* 131 Vt 563, 313 A2d 33, 40 (1973). The only case we have found to the contrary is *State v. Johnson,* 68 NJ 349, 346 A2d 66, 68 (1975), where the court, without stating why the analysis under its constitution should be different, announced that the New Jersey Constitution requires proof that the suspect know of his right to refuse consent.

violate that amendment if its own constitution and laws, as enforced by its courts, in fact protect the claimed right. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

This court enforced Oregon's constitutional guarantee against warrantless or unreasonable searches and seizures, Or Const art I, sec 9, many years before this became a federal issue. *See, e.g., State v. Laundy,* 103 Or 443, 204 P 958, 206 P 290 (1922); *State v. McDaniel,* 115 Or 187, 231 P 965, 237 P 373 (1925). In this case the majority chooses to adopt a rule that a search and seizure which would normally require a search warrant does not invade a person's constitutional rights if he or she has "consented" to the search without being "coerced," even though the person is in custody in a police station and is unaware of having any legal right to refuse consent, but rather believes that the police are entitled to do as they wish. Such a rule is hostile to the search warrant requirement of article I, section 9, and to the great principle that it embodies.

Because other matters discussed by the majority are not in dispute, the following should be clearly understood:

*First.* The central issue concerns the use of evidence obtained in a search made by the police without a search warrant. This issue does not concern the *Miranda*[1] warnings, which deal with police questioning rather than searches, nor the use of statements obtained from the defendant.

*Second.* The issue in this case is not the legality of a search incident to an arrest, neither of a defendant's person nor of his automobile or immediate surroundings. Rather it involves the search without a warrant of a location remote from the arrest, when a warrant might readily have been sought, and rationalized only by defendant's supposed "consent" while in custody in

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR 3d 974 (1966).

the police station. The fact that the search was of a locker is immaterial on the constitutional issue. *See United States v. Chadwick,* — US —, 97 S Ct 2476, 53 L Ed 2d 538 (1977). It must be understood that the majority's view, dispensing with a search warrant under these circumstances, will apply exactly the same if any man or woman, in custody and ignorant of constitutional law, "consents" to letting the police use the keys taken from a pocket to go and search his or her home at leisure. Under this rule, such a search would not depend on a magistrate's independent finding of "probable cause" nor on describing "the place to be searched and the person or thing to be seized," the essential safeguards of the constitutional guarantee. *See also* ORS 133.525-133.615. Any assent, whether given from misconception of the law, misplaced bravado, or fear short of coercion, opens the door.

*Third.* The rule chosen by the majority is in no way compelled by any federal law or federal decision, as the majority acknowledges. It must stand on its own merits as a matter of Oregon law. *Oregon v. Hass,* 420 US 714, 95 S Ct 1215, 43 L Ed 2d 570 (1975); *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974).

*Fourth.* The question is not whether article I, section 9 was meant to embody the same principle as the federal fourth amendment, the guarantee against warrantless or unreasonable searches and seizures. Of course it was. It may equally be pointed out that the fourth amendment meant to embody that principle from the state constitutions that preceded the federal Bill of Rights. For instance, the Pennsylvania Declaration of Rights, adopted at the moment of Independence, declared:

> That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not

particularly described, are contrary to that right, and ought not to be granted.[2]

The rule adopted by the majority is far from the spirit of these early declarations.

The question is, rather, what safeguards this principle embodied in article I, section 9, extends to the people of Oregon. That question is not answered by the decisions in *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973) and *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976). It cannot be answered by the Supreme Court of the United States but only by this court. Obviously, if the present case had arisen before *Schneckloth, supra,* this court would have had to form its own judgment.[3] It does not escape that responsibility after *Schneckloth.*

We turn, therefore, to the merits of the view which the majority takes from *Schneckloth* and *Watson,* the view that a warrantless search may be based on the uninformed assent of a suspect in police custody.

That view was criticized and rejected in a post-*Schneckloth* report by the experts who prepared the model Code of Pre-Arraignment Procedure for the American Law Institute, and by the A.L.I. in approving that code. The institute adopted the position that before undertaking a search on the basis of consent, an officer must inform the individual whose consent is sought that he need not consent and that anything found may be used as evidence, and if the individual is in custody, further inform him of his right to consult

---

[2] Pennsylvania Declaration of Rights, section X (1776). *See also* Delaware Declaration of Rights, section 17 (1776), Maryland Declaration of Rights, section XXIII (1776), Virginia Declaration of Rights, section 10 (1776).

[3] The court in fact had to do as much in *State v. Williams,* 248 Or 85, 432 P2d 679 (1967), when it adopted the view that evidence could be seized by "consent" only if the suspect had been informed that he could refuse consent. The fact that defendant in that case, and the court, skipped article I, section 9, to rely on the fourteenth amendment reflects the litigation habits of the 1960's.

counsel or friends before deciding; in short, the institute would treat waiver of the protection of a search warrant the same as waiver of the right to remain silent. A.L.I. Code of Pre-Arraignment Procedure sec. SS 240.2 (1975). The accompanying commentary stresses these points:

> If there is one thing that comes through clearly from almost all of the cases on this issue, whichever way they come out on the warning requirement, it is the extreme difficulty of determining from the record the extent to which the person whose consent was sought acted on the assumption that the police had a right to make the search.
>
> \* \* \* \* \*
>
> It seems unlikely that there is any greater knowledge of one's right to refuse a search than the right to silence. The law relating to availability of a warrant, the right to search without a warrant and the admissibility of evidence seized is at least as confusing to the layman as the law relating to oral admissions.
>
> Furthermore, in at least two respects the argument for requiring warning in the case of a consent search seems clearly stronger than that for requiring warning prior to interrogation. First, by the consent search the officer is seeking to short-circuit another means available to him—the use of a warrant—to obtain evidence. No such alternative exists with respect to information sought by interrogation. It seems far less justifiable to omit the protection of the warning when, by the very act of seeking consent, the officer is depriving the person from whom it is sought of the protective screening of judicial involvement in the issuance of the warrant. . . .[4]

---

[4] *Id.* at 533, 534. The commentary also reports:

It has been the practice of the FBI for decades to obtain from a person whose consent to a search is sought a written from of authorization. As reflected in the form itself, the Agent is to warn the person whose consent is sought of his rights. It is not entirely clear what the FBI's practice with respect to warning is when Agents are actually invited to search, but apparently an oral warning of rights is given even when a suspect refuses to sign the form.

The Bureau of Narcotics and Dangerous Drugs uses a consent form similar to that of the FBI and the regulations require that agents have

But we need not in this case go so far as the American Law Institute. The constitutional protection of a search warrant may certainly be waived by the person whom it protects; the question to be determined in each case is whether it has been knowingly waived. On that question, the fact that the person was explicitly informed before giving consent is certainly the strongest evidence, but it is not the only evidence. Sometimes it may be possible to prove by other means that even without a warning, the consent was given with full knowledge that it could be refused.[5] This is the view of warrantless "consent" searches taken by the Supreme Court of New Jersey after *Schneckloth,* even where the suspect was not in custody:

> We conclude that under Art. I, par. 7 of our State Constitution the validity of a consent to a search, even in a non-custodial situation, must be measured in terms of waiver; *i.e.,* where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent.
>
> Many persons, perhaps most, would view the request to a police officer to make a search as having the force of law. Unless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful. One cannot be held to have waived a right if he is unaware of its existence. *State v. Johnson,* 68 NJ 349, 346 A2d 66, 68 (1975).

The court remanded the case for specific findings of fact by the trial court bearing on the individual's knowledge of her right to refuse consent to the search. We do not know whether the New Jersey court would go further to require warnings when the suspect is in

it signed before making a consent search. The Bureau's manual is also explicit that even after a person has been arrested and been given the *Miranda* warning, he must be warned again as a condition of obtaining consent to search. *Id.* at 535-536.

[5] See Justice Marshall's dissent in *Schneckloth v. Bustamonte, supra,* 412 US at 286, 93 S Ct at 2078, 36 L Ed 2d at 897.

custody. In any event, it is distressing to think that the rights of Oregon citizens should not be safeguarded as much in the stress of police custody as those of New Jersey's are on the street.

A requirement of *knowing* consent, rather than merely *uncoerced* consent,[6] would require reversal on the record of this case. Indeed, in its concentration on overruling *State v. Williams, supra,* and falling in line with *Schneckloth* and *Watson,* the majority has given insufficient attention to the question whether, on its facts, this case passes the test of those decisions. This is doubtful at best. In *Watson,* decided only last year, the United States Supreme Court took the trouble to point out that Watson's consent to the search "was given while on a public street, not in the confines of the police station," and that, after being given the *Miranda* warnings, he "was further cautioned that the results of the search of his car could be used against him." 423 US at 424-425, 96 S Ct at 828, 46 L Ed 2d at 609. Neither factor is present in this case. Instead, the following occurred in the police station. The questions and answers were translated into and from Spanish, which is omitted here. Defendant was asked:

> Q. Did you give us the keys and say it was all right to go up and look in those lockers? [Translated into Spanish] * * *

<hr>

[6] Adoption of "voluntariness" or "coercion" as the test whether a constitutional right has been unknowingly sacrificed takes the courts and the police back to the morass of case-by-case evaluation of factors (such as age, ethnic background, education, prior experience, number of interrogating officers, etc.) bearing on the susceptibility of the suspect and the atmosphere of the police station that occupied the courts in the 1940's and 1950's. See the cases listed by Justice Clark, dissenting, in *Haynes v. Washington,* 373 US 503, 520, 83 S Ct 1336, 1347, 10 L Ed 2d 513, 526 (1963), *e.g., Lynumn v. Illinois,* 372 US 528, 83 S Ct 917, 9 L Ed 2d 922 (1963); *Gallegos v. Colorado,* 370 US 49, 82 S Ct 1209, 8 L Ed 2d 325, 87 ALR2d 614 (1962); *Reck v. Pate,* 367 US 433, 81 S Ct 1541, 6 L Ed 2d 948 (1961); *Haley v. Ohio,* 332 US 596, 68 S Ct 302, 92 L Ed 224 (1948), and also *Blackburn v. Alabama,* 361 US 199, 80 S Ct 274, 4 L Ed 2d 242 (1960). *See* Comment, *The Coerced Confession Cases in Search of a Rationale,* 31 U Chi L Rev 313 (1964). Given that prospect, police and prosecuting officers may well consider it a sensible precaution to obtain a written or tape recorded, informed waiver before conducting a "consent" search, even if the present decision does not make it indispensable.

A. * * * Yes, you asked for the keys and I gave them to you. [Translated from Spanish]

Q. * * * Did we force you into givin' us those keys, did you tell us it was all right to go up there and go in there?

A. Yes, all right.

Q. You said that was all right?

A. Yes, all right.

Q. (To officer Murillo:) You ask him if he understands that we didn't force him, that he said it was all—OK for us to go up there and look in those lockers. [Translated into Spanish]

A. OK, you are the officers and then, of course, I have to cooperate with you. If an officer asks you for something I have to give it to you. No I don't say that I have been forced, but anyway I have to give it to you. [Translated from Spanish]

Q. Did you understand that you didn't have to give 'em to us? [Translated into Spanish]

A. OK, it's not that I don't want to give you the keys, but as I am telling you, you are the officers, it is my obligation to deliver—or show you identification or any other thing—so I'll be free to go if I cooperate, but it wasn't possible—I wasn't free to go after all. [Translated from Spanish][7]

It may well be that the record here does not make out a "voluntary consent" to a warrantless search of remote premises under *Schneckloth* and *Watson.* But if *Schneckloth* and *Watson* do mean that a person in such circumstances has abandoned the protection of a search warrant, those decisions should not be adopted in applying Oregon's Bill of Rights.

Denecke, C.J., and Lent, J., join in this dissenting opinion.

---

[7]State's Exhibit 44, taped statement of defendant at police station. It should be noted that the trial court's findings, quoted by the majority, appear to relate to the rights mentioned in the *Miranda* warnings; the state does not claim that the record shows defendant to have been advised with respect to the search.