STATE OF OREGON, *Respondent,*
*v.*
MICHAEL LYNN GREENE, *Petitioner.*
(No. 76-11-109, CA 8035, SC 25650)

591 P2d 1362

Gary L. Hooper, Deputy Public Defender, Salem, argued the cause for petitioner. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

John W. Burgess, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Stephen Kanter, Portland, filed a brief amicus curiae in behalf of Oregon American Civil Liberties Union.

DENECKE, C. J.

Linde, J., specially concurring.

**DENECKE, C. J.**

We granted review in this and three other cases in order to attempt to clarify the law relating to the search and seizure of vehicles. *State v. Fondren,* 30 Or App 1045, 568 P2d 721 (1977); *State v. Downes,* 31 Or App 419, 571 P2d 914 (1977); *State v. Groda,* 32 Or App 287, 573 P2d 1269 (1978).

We are governed by the Fourth Amendment to the Constitution of the United States and § 9, Art I, of the Oregon Constitution. With few exceptions not pertinent here, Oregon statutes do not attempt to cover searches and seizures without a warrant.

We must accord the defendant at least as much protection as he is entitled to under the Fourth Amendment as interpreted by the United States Supreme Court. If § 9, Art I, affords more protection to the defendant than does the Fourth Amendment, this greater protection must be accorded defendant. In at least two aspects of search and seizure we have held that the Oregon Constitution affords no more protection than the United States Constitution. *State v. Florance,* 270 Or 169, 182, 527 P2d 1202 (1974); *State v. Flores,* 280 Or 273, 279, 570 P2d 965 (1977). While the defendant relies upon the Oregon Constitution as well as the United States Constitution, he does not point out any reasons why we should depart from the analysis that the United States Supreme Court has developed in its decisions. As we stated in *Flores, supra* (280 Or at 279), "we see no persuasive reason to do so." Accordingly, we look to these decisions.

The scenario in this case starts with three armed men breaking into a residence, assaulting the occupants and stealing money, jewelry and other property. A neighbor was able to describe the car in which the thieves drove away, including the license number, and to generally describe the three men. The police established that the car belonged to a Beverly Stanton. The morning after the crime at 10:15 a.m. an officer went to the address listed for Stanton and a car fitting the

description given by the neighbor, including the license number, was parked in the residential driveway. Police started gathering near Stanton's house shortly thereafter and they learned by inquiring of neighbors that several men matching the general descriptions of the men who committed the burglary lived in the Stanton house. Shortly after noon, the 14 officers then gathered broke into the house. Stanton and a friend were in the house, but the defendant and his alleged accomplices were not. The car was towed to the police station and searched. The police did not attempt to get a warrant for the search of the car or house. Several blood-stained items of clothing were found in the trunk. The blood type matched that of one of the victims who had been assaulted during the robbery.

Defendant filed a motion to suppress. The trial court granted the motion as it pertained to the house search, but denied it as to the items found in the car. Defendant was convicted. The Court of Appeals affirmed the trial court's denial of defendant's motion to suppress, but reversed and remanded for a new trial because of the trial court's failure to give a requested instruction. *State v. Greene,* 30 Or App 1019, 568 P2d 716 (1977).

■   If the search can be sustained, it must be on the basis of the doctrine of *Carroll v. United States,* 267 US 132, 45 Sup Ct 280, 69 L Ed 543, 39 ALR 790 (1925). The Court of Appeals sustained the search on that ground. The essence of the doctrine of *Carroll v. United States, supra* (267 US 132), is that a search of an automobile may be made without a warrant if (1) the officers have probable cause to believe that the vehicle contains contraband, stolen goods, evidence of crime, etc., and (2) that there are exigent circumstances present which require that the vehicle be searched without obtaining a warrant. Underlying both of these propositions is the overall principle repeatedly stated by the United States Supreme Court and this court that searches conducted without a

warrant are *per se* unreasonable, subject only to a few exceptions. For example, *Katz v. United States,* 389 US 347, 357, 88 S Ct 507, 19 L Ed2d 576 (1967); *State v. Miller,* 269 Or 328, 334, 524 P2d 1399 (1974).

The first inquiry is, did the officers have probable cause? More specifically, did the officers have probable cause to believe that the vehicle contained some of the property stolen the night before or some evidence of the crime? The defendant did not strongly contend there was a lack of probable cause; however, we are of the opinion that it is a close question.

"Probable cause" is a reasonable belief that the car contains evidence. *United States v. Kalama,* 549 F2d 594, 595 (9th Cir 1977); *State v. Cloman,* 254 Or 1, 10, 456 P2d 67 (1969). The case cited by the Court of Appeals supporting its opinion that the officers in the present case had probable cause illustrates when the question of probable cause is easily answered. That case is *State v. Poole,* 11 Or App 55, 500 P2d 726 (1972). There, an officer received a broadcast that a burglary was in progress. The car involved was described, including the license number, a description of the burglars and their direction of travel. Six minutes after receiving the broadcast the officer saw the car described in the broadcast speeding in the direction stated in the broadcast. The officer followed and when the car parked, the officer stopped and searched the car. It appears obvious in these circumstances that the officer could reasonably believe that the car contained fruits or evidence of the crime.

The present case is not that obvious. The car was found the morning after the crime had been committed. It was found in the owner's driveway and the owner had not been identified as being present at the crime. It is questionable whether thieves commonly leave stolen money, jewelry and weapons overnight in the trunk of a car parked outside.

As stated, we are of the opinion that probable cause is a close issue; however, we conclude that under the

facts of the present case, when a car used in a theft is found within hours after the theft at a house where persons matching the description of the thieves appear to reside, the circumstances provide probable cause to believe that the car contains evidence of the crime.

The other requirement for search without a warrant is "exigent circumstances." The principal contention of the defendant is that there were no exigent circumstances.

■ The exigent circumstances requirement is based upon practical necessity. The logic is as follows: Ordinarily, a search is not authorized without a warrant; however, a warrant is not necessary if there is probable cause and if any evidence that might be present likely will have disappeared if the officers cannot seize and search before securing a warrant. *Chambers v. Maroney,* 399 US 42, 51, 90 S Ct 1975, 26 L Ed2d 419 (1970).

The sharpness of this logic has been blurred by a statement in *United States v. Rabinowitz,* 339 US 56, 66, 70 S Ct 430, 94 L Ed 653 (1950), which has been repeated. "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." *Rabinowitz* was overruled by *Chimel v. California,* 395 US 752, 768, 89 S Ct 2034, 23 L Ed2d 685 (1969). However, as late as 1976 in *South Dakota v. Opperman,* 428 US 364, 372-373, 96 S Ct 3092, 49 L Ed2d 1000 (1976), the majority quoted with seeming approval an opinion by Mr. Justice Black to this effect. The majority opinion in *Opperman,* however, did not depend upon the application of that statement from *Rabinowitz* and we are of the opinion that it is no longer a pronouncement of the United States Supreme Court which we are bound to follow in interpreting the Fourth Amendment. Mr. Justice Powell specifically so stated in his concurring opinion in *Opperman* at pp 377-378. The majority also specifically so held in *United States v. United States District Court,* 407 US 297, 315, 92 S Ct 2125, 32 L Ed2d 752 (1972).

That leaves the question, could the officers reasonably have sought a search warrant? An ancillary question is, at what time should this be determined: when the car was initially seized at Stanton's residence or when the car was searched at the police station? This question is answered by *Chambers v. Maroney, supra* (399 US 42). The facts in *Chambers* were that within an hour after the night robbery of a filling station by armed bandits, the police stopped a car matching a description of the car used in the robbery on a public street. The occupants were arrested and the car brought to the station and searched. The majority held the car could be searched when it was stopped "since there was probable cause to search and it was a fleeting target for a search." 399 US at 52. The majority went on to reason that the right to search continues if the police choose to take the car to the station and make the search there.

The latter reasoning of the majority was based upon the premise that the alternative to taking to the station to search was a warrantless seizure of the car at the point of stopping and a denial of use or access to anyone while the officers attempted to secure a warrant and the opinion that such alternative action was a no lesser intrusion than a warrantless search. The majority stated: "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." 399 US at 52.

The defendant and the amicus argue that *Coolidge v. New Hampshire,* 403 US 443, 458-464, 91 S Ct 2022, 29 L Ed2d 564 (1971), governs this case and requires a decision that the evidence was unconstitutionally secured. We do not regard the decision in *Coolidge,* whether it be merely by a plurality or a majority, as being contrary to the general principle stated in *Chambers.* The Court held in *Coolidge* that the warrantless search of the car was invalid because there

[343]

were not such exigent circumstances that the officers were excused from attempting to get a warrant. That there was ample time to obtain a warrant is best proved by the fact that officers in *Coolidge* did get a warrant and made the search pursuant to the warrant. The reason the issue of whether the search would be valid without a warrant arose is that the Court held the warrant was constitutionally defective because it was issued by the Attorney General and not a judicial officer.

In addition to the actual issuance of a warrant, the other facts show the reasonableness of securing a warrant. As the plurality opinion observes, for two and one-half weeks the state was accumulating evidence on the defendant and the officers had known for some time of the probable role of the car in the crime.

In the present case the defendant contends the officers had ample time to apply for a warrant to search the car. He relies upon the fact that the car was first observed by an officer about 10:15 a.m. and was under constant observation for the next two hours by an increasing number of officers. A short time after 12:00 a.m. the officers went into the house and some time thereafter seized the car and took it to the station.

Defendant argues that if the defendant, the owner Stanton, or anyone else attempted to move the car or take anything out of it before a warrant to search was obtained, the officers were present to stop them.

This argument is similar to the argument made by the defendant in *Chambers v. Maroney, supra* (399 US 42), and rejected by the Court. The officers in this case had reason to believe that someone might come out of the house at any time and attempt either to drive the car away or remove something. The officers then would have the choice of either letting the evidence disappear or seizing the car despite the lack of a warrant. *Chambers* approved the latter procedure and equated it as no greater intrusion than a warrantless search.

[344]

It may be suggested that the required course should be to attempt to secure a warrant for search and seizure in the hope that a warrant could be obtained before anyone attempted to remove the car or evidence in the car. We conclude that it would not be correct to determine Fourth Amendment rights on the happenstance of whether someone will try to remove a car or evidence before or after a warrant is obtained. The distinct possibility was present that someone might try to do so before a warrant could be obtained and that supplies the exigent circumstance.

We hold that there were exigent circumstances and the officers were justified in searching the car.

Affirmed.

**LINDE, J.,** specially concurring.

I concur in the Court's disposition of today's search-and-seizure cases, though in this case I would suppress the evidence obtained by a warrantless search of the automobile trunk. The present opinion relates to problems common to all four cases.

The Court begins its opinion by noting that we granted review "in order to attempt to clarify the law relating to the search and seizure of vehicles." That is a worthy ambition but an incautious one. Regrettably, in my opinion, the goal of a clear and comprehensive statement of the law of Oregon governing police searches of vehicles or of anything else will not be achieved by the means by which the Court pursues it. Since the subject is of continuing importance to law enforcement officers, to trial courts, and to the public, it deserves to be said why not. A clear and comprehensive statement of Oregon law governing searches and seizures will not result because an appellate court has occasion to speak only on the particular factual situations that are brought before it, because these situations come before it in the context of excluding evidence in criminal trials, and because the Court has been reluctant to treat the problem as one of Oregon

law at all, at least in the absence of principled argument by counsel who treat it as one of federal law.

## I

There can be no doubt that the authority of law enforcement officers to search or to seize persons, vehicles, houses, and other private effects, and the limits of that authority, ought to be defined by law, and that both the authority and its limits ought to be as understandable both to the public and to its officials as it is possible to make them. There is no more fundamental area of confrontation between governmental power and the individual. When we rely on explicit and detailed legal procedures by which government may grant or deny an individual a license for some activity, or collect a tax, or regulate the conduct of a business or the use of property, it is not unreasonable to suppose that there are similarly explicit and detailed legal procedures for searching or seizing a person or his property. It is not unreasonable to believe that, but it is unfounded.

It might seem surprising to members of the public that the authority of law enforcement officers to search or to seize their property or other effects without a warrant in most respects is not expressed in or defined by any law, at least in Oregon. If so, the surprise reflects in part a misconception of constitutional law. Of course, the state and federal constitutions impose outer limits on the permissible range of authority to conduct searches and seizures, as today's cases show. But the constitutions neither grant such authority to anyone, nor prescribe who may exercise it, nor define the circumstances and manner in which, within those outer constitutional limits, the authority should or should not be employed. These are questions which, as far as the powers of state and local officers are concerned, are left to state law. Like all public law and its administration, they are the responsibility of politically accountable legislators and other state and local officials. When a court is called upon to decide only whether a particular search or seizure crossed the

constitutional boundary, its decision marks only that boundary; it does not prescribe the law with respect to the officer's authority to conduct the search or seizure apart from that outer limit. Within this limit, the question of his authority is not a constitutional question but one of ordinary law.

This is uniquely clear in the Oregon constitution. While all state constitutions, as well as the federal fourth amendment, forbid unreasonable searches and seizures and provide for the issuance of warrants, only Oregon's Bill of Rights expressly assumes that the subject will be governed by laws. Article I, section 9, reads:

> *No law* shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched and the person or thing to be seized. (Emphasis supplied.)

I do not suggest that the emphasized words change the substance of what constitutes an unconstitutional search and seizure. But in declaring that *no law* shall violate the constitutional limits those words express clearly what should be implicit in any event: that a search or seizure is supposed to be authorized and governed by a law before a question arises whether that law authorized something that the constitution forbids. Of course, when an officer's act exceeds his legal authority, there is no occasion to consider its constitutionality. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

Nevertheless, as noted above, the authority and the rules for the conduct of searches and seizures in Oregon are rarely expressed or defined in any law. There are general statutory provisions for arrests, ORS 133.005-133.455, and for searches and seizures under a warrant issued by a judge, ORS 133.525-133.727, but few provisions for the warrantless searches and seizures that give rise to most of the

litigated cases.[1] The result is to turn the relationship between the law and the constitution expressed in article I, section 9, *supra,* upside down: The opinions of courts are widely treated as the source for determining the legal authority of the police, even though these opinions cannot and do not purport to do more than to decide whether a particular exercise of police authority has exceeded constitutional limits.[2]

Moreover, the decisions of Oregon courts offer no guidance to what the law of Oregon might be as long as both court and counsel measure the legality of the particular police conduct by matching it against the facts and the holdings of the latest decisions of the United States Supreme Court under the federal fourth amendment. Those decisions under a constitutional

---

[1] *Scattered sections of the Code state rules for searches or seizures* without a warrant under particular circumstances or in connection with specific offenses. *See, e.g.,* ORS 131.625 (seizure of weapon during frisk of person stopped pursuant to ORS 131.625); ORS 133.460 – 133.495 (stolen livestock and vehicles used in their theft); ORS 165.070 (seizure of fraudulent communications device); ORS 167.247 (search of conveyances on knowledge or information that they are being used to transport narcotics illegally and seizure of drugs and conveyance if drugs are found); ORS 471.405 (seizure of illegally imported or purchased alcoholic beverages); ORS 471.660 (seizure of conveyance used to transport alcoholic liquors illegally); ORS 496.660 (search of any place except private dwelling house on evidence of wildlife law violations); ORS 496.675 (seizure of illegally possessed wildlife and any apparatus used for illegal hunting or fishing).

Other statutes authorize seizure of items deemed dangerous to public health, though not necessarily connected with a potential prosecution. For instance, the Assistant Director for Health may seize animals suspected of rabies, ORS 433.350, or unsanitary bedding, ORS 433.600, and the Department of Agriculture is authorized to seize diseased bees, ORS 602.087, or adulterated or misbranded food or consumer commodities, ORS 616.225.

[2] As the late Professor Herbert Packer pointed out, courts fill the gap in the law of the law enforcement process

only in the discharge of their duty to construe the Constitution in cases that come before them. And so, the rules of the criminal process, which ought to be the subject of flexible inquiry and adjustment by lawmaking bodies having the institutional capacity to deal with them, are evolved through a process that its warmest defenders recognize as to some extent awkward and inept: the rules become "constitutionalized."
. . .

Packer, *The Courts, the Police, and the Rest of Us,* 57 J Crim Law, Criminology, and Police Science 238, 240 (1966).

guarantee essentially identical to Oregon's deserve the highest respect, and by virtue of the fourteenth amendment they prescribe a standard below which no state may fall, but they do not purport to decide any question of the law of Oregon or any other state. That each state was responsible for its law of search and seizure was fully understood as recently as 1960.[3] This court has repeatedly recognized that this responsibility continues today, even when the majority concludes, as in the present cases, that "we see no persuasive reason to do so" quoting *State v. Flores,* 280 Or 273, 279, 570 P2d 965 (1977). Thus the proper sequence of analysis is, first, whether a particular official action is authorized by law, second, whether it contravenes the Oregon constitution,[4] and only then whether it satisfies the fourteenth amendment; for when a state in fact protects a person's asserted rights under its law, there can be no question of violating the fourteenth amendment.

The Court reverses the sequence by looking directly to decisions of the United States Supreme Court and then "adopting" them to deal with each particular case. As a result, we sometimes do not know what the law in Oregon is until the United States Supreme Court tells us. *See, e.g., Oregon v. Mathiassen,* 429 US 492 (1977). Whatever this approach gains in convenience, the one thing it assuredly cannot do is to "clarify the law relating to the search and seizure of vehicles" by Oregon law enforcement officers, as the Court wishes. It cannot do so because this approach can describe only constitutional limitations, not initial authority and directives, and because what this court

---

[3] The contemporary custom of testing state searches and seizures under federal decisions only dates from *Mapp v. Ohio,* 367 US 643 (1961), which extended the obligation to exclude evidence seized in violation of the fourth amendment to all states.

[4] Since authorizing laws are normally interpreted to allow only constitutional applications, such an action is likely to be found unauthorized. *See, e.g., State v. Harmon,* 225 Or 571, 577, 358 P2d 1048 (1961); *Peninsula Drainage Dist. No. 2 v. City of Portland,* 212 Or 398, 418, 320 P2d 227 (1958).

[349]

has to say about federal constitutional limits remains relevant only until the next decisions of the United States Supreme Court.[5] In applying the proper reading of Supreme Court decisions to the facts of search-and-seizure cases, this court can add relatively little to the work of the Court of Appeals, which sees far more such cases. We are, however, responsible for the law of Oregon.

## II

The need both for clarity in the law of search and seizure and for caution in seeking it in the cases was expressed in the opening paragraph of one leading study of the subject:

> "THE COURSE OF TRUE LAW pertaining to searches and seizures," Justice Frankfurter once observed, "has not—to put it mildly—run smooth." There are many debated and debatable points concerning search and seizure, but this certainly is not one of them. This field of law, sometimes characterized as a "quagmire," sometimes as a "no-man's land," has not been marked by even and steady growth. The Supreme Court has acknowledged that many of its decisions cannot be reconciled, and the same might be said for the decided cases of other courts.[6]

LaFave, *Search and Seizure: "The Course of True Law...Has Not...Run Smooth"*, 1966 Ill L For 255. Nothing in the intervening dozen years has outdated those observations, though new ones have joined them. As an example of law developed through case-by-case adjudications, it has been said, "the fourth amendment cases are a mess." Dworkin, *Fact-Style Adjudication and the Fourth Amendment: The Limits of Lawyering*, 48 Ind L J 329 (1973). "The Amendment," wrote Professor LaFave in 1974, "continues to spawn a

---

[5] During the current term, the Supreme Court has before it nine cases involving the fourth amendment.

[6] The sources quoted in the paragraph were *Chapman v. United States,* 365 US 610, 618 (1961) (concurring opinion); *id.* at 622 (Justice Clark, dissenting); Kaplan, *Search and Seizure: A No-Man's Land in the Criminal Law,* 49 Calif L Rev 474 (1961); *Abel v. United States,* 362 US 217 (1960).

seemingly endless stream of litigation; as some issues are finally put to rest, still others surface and cry out for resolution."[7] Professor Anthony G. Amsterdam opened his Oliver Wendell Holmes Devise Lectures with the observation that "[f]or clarity and consistency, the law of the fourth amendment is not the Supreme Court's most successful product." His point was not so much criticism as appreciation of the difficulty of producing operational rules in the course of deciding appeals from convictions.[8] Similarly, I too cite these comments only to support my initial point that the goal of a clear and comprehensive statement of Oregon law will not be achieved by the Court's approach of case-by-case matching against the facts and holdings of Supreme Court decisions.

The intermittent and episodic nature of case-by-case adjudication is only one difficulty in relying on this to produce clear and comprehensive rules. Another is that appellate opinions face the issues only after the fact, when the issue is the suppression of evidence actually found, and usually upon the appeal of a defendant who has been found guilty of a crime. When official power to search or seize persons or property is discussed only in the appeals of convicted defendants, it appears as if the law of search and seizure is a special privilege of interest only to criminals. As Judge Shirley Hufstedler has said:

[7] LaFave, *"Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma,* 1974 S Ct Rev 127.

[8] Likening fourth amendment law to the definition of a camel as a horse drafted by a committee, Amsterdam pointed out that

the Court is in the unenviable posture of a committee attempting to draft a horse by placing very short lines on a very large drawing-board at irregular intervals during which the membership of the committee constantly changes. In addition, unlike most committees, the Court is expected to write a reasoned opinion explaining the placement of each of these short lines without unduly extending the lines so as to make perfectly comprehensible why, in its judgment, the resulting camel is a horse. You will appreciate, I think, that I question the entire fairness of a critic who rides merrily up upon his own horse and deprecates the Court's camel by comparison.

Amsterdam, *Perspectives On The Fourth Amendment,* 58 Minn L Rev 349, 350 (1974).

The subtleties of that enforcement by indirection have almost wholly escaped the public and appear to have often eluded the Court itself. The message most widely received is that the Fourth Amendment is a shield solely for the guilty. It is a hard message to correct because the visible beneficiaries of the exclusionary rule are persons subjected to searches and seizures that have yielded evidence of crime. People subjected to illegal searches that turn up nothing incriminating do not appear in the criminal process. Illegal searches rarely surface in a civil proceeding because legislatures and courts have not created effective civil remedies.

Hufstedler, *The Directions and Misdirections of a Constitutional Right of Privacy,* 26 Rec of Bar of NY 546, 555 (1971). I shall not repeat here what this court set forth on the same point only last month.[9] Perhaps a warrantless arrest or personal search or the seizure of an automobile would be perceived quite differently in a civil action by an outraged, lawabiding citizen, especially one neither young nor a member of an ethnic minority. However, our present concern is not with remedies[10] but with the rules of searches and seizures themselves.

The crucial point is this: Whether these rules preserve "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure," in the constitutional words, must be judged precisely by assuming their use against an innocent, respectable, ordinary citizen. That is the fundamental premise of the guarantee.

---

[9] *State v. Warner,* 284 Or 147, 162-164, 585 P2d 681 (1978), quoting Kamisar, *Is the Exclusionary Rule an "Illogical" or "Unnatural" Interpretation of the Fourth Amendment?* 62 Judicature 66, 77 (August 1978).

[10] Federal civil remedies extend to the invasion of the constitutionally protected interest itself, apart from state tort actions for false arrest or trespass to persons or property. *See Bivens v. Six Unknown Named Agents,* 403 US 388 (1971); *Monroe v. Pape,* 365 US 167 (1961). An officer's act which violates 42 USC §1983 is a governmental tort in Oregon, at least unless the act is expressly authorized by a law or regulation. ORS 30.265(1) and (3)(f). For the availability of preventive relief, *see Cornelius v. City of Ashland,* 12 Or App 181, 506 P2d 182 (1973).

Only if a businessman whose mysteriously lost automobile is found in the police garage ought to be satisfied when told that there was probable, though mistaken, reason to believe that it contained stolen property; if a housewife whose door is forced open should recognize the need to act upon credible though erroneous reports that illegal drugs were cooking in her kitchen; if an editor should willingly give up his briefcase to a warrantless search when an officer has reliable, though unfortunately false, information that it contains forged securities or pictures of fugitives; only then can these be "reasonable" warrantless searches or seizures in other cases that in fact turn up drugs or stolen goods—otherwise they are not. That is the test.

Obviously a test of searches and seizures from the perspective of the lawabiding respectable citizen is not easy to develop in the context of a stream of appeals by convicted criminals. Moreover, a judicial role limited to the suppression of evidence after the fact comes too late and, by definition, in the wrong instances to protect those against whom no evidence is found. *See, e.g.,* LaFave and Remington, *Controlling The Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions,* 63 Mich L Rev 987 (1965). The first great strain on the rules of searches and seizures, particularly of automobiles, came during the bootlegging days of the Prohibition era, *see Carroll v. United States,* 267 US 132 (1925); *State v. DeFord,* 120 Or 444, 250 P 220 (1927); half a century later, we see this strain repeated in the suppression of the illegal drug traffic. That context makes it no easier for judges than for the public to recognize, in the suppression of evidence against burglars and drug dealers reported in the back pages of the daily newspapers, the same fourth amendment which protects Americans against the kind of events, domestic and foreign, that in our time have marked the front pages. Yet only that perspective fits the history and the enduring role of the constitutional guarantee.

The limited capacity of appellate opinions to lay down affirmative directives for warrantless searches and seizures has led to modern recommendations that this be done by legislation or by administrative rules of the police departments themselves. As stated earlier, the grant of authority to law enforcement officers to seize or to search persons or property and the circumstances and manner in which this authority should or should not be employed are, within constitutional limits, the responsibility of politically accountable officials. In view of the importance of these subjects, one might reasonably expect to find them in legislation. That course has in fact been taken in a number of states but not in Oregon, although, as pointed out above, the existence of a "law" on the subject is presupposed by article I, section 9 of the constitution.[11] Alternatively or in addition more detailed operational rules could be adopted, under a legislative directive or on their own initiative, by local officials or the executive heads of the law enforcement agencies themselves. *See, e.g.,* ORS 181.280, authorizing the Superintendent of the Oregon State Police to

---

[11] *See, e.g.,* Ill Ann Stat ch 38, §108-1 (1970); Kan Stat Ann §22-2501 (1974); NC Gen Stat §§15A-221, 15A-222, 15A-223, 15A 231 (1975); Wis Stat Ann §968.10 (West 1971). Statutory provisions for warrantless searches were proposed by the Oregon Criminal Law Revision Commission in 1972, but only a few were enacted in 1973. *See* Platt, *A Legislative Statement of Warrantless Search Law: Poaching in Sacred Judicial Preserves?* 52 Or L Rev 139 (1973). Some proposals of the Commission's report relating generally to searches and seizures without a warrant were enacted in 1973, *e.g.* ORS 131.615 (authorizes officer to make non-custodial stops on reasonable suspicion); ORS 131.625 (authorizes frisk of stopped person and seizure of weapons); ORS 131.655 (authorizes officers and merchants to detain persons on reasonable cause to believe they have committed or attempted theft in a store); ORS 133.535 (lists permissible objects of search and seizure including "a person for whose arrest there is probable cause"); ORS 133.623 (disposition of things seized without a warrant); ORS 133.623 − 133.663 (procedures for return of seized items); ORS 133.693 (1) and (4) (challenging the truth of evidence offered to support warrantless search).

As ORS 484.435 shows, the legislature sometimes assumes that a search or seizure requires some authorization. That section provides that "[s]earches and seizures *otherwise authorized by law* incidental to an arrest shall *not be authorized*" if the arrest is for a minor traffic infraction. (Emphasis supplied.)

issue rules and instructions to its officers. As Judge Carl McGowan has pointed out, we take this for granted in the public enforcement of laws other than the criminal code. *See McGowan, Rule-Making and the police,* 70 Mich L Rev 659 (1972).[12]

[12] Judge McGowan cited these earlier sources that have made the same recommendation: ABA Project on Minimum Standards for Criminal Justice, Standards Relating to the Police Function (Tentative Draft, Oct 1971); K. Davis, *Discretionary Justice,* 80-96 (1969); National Advisory Comm. on Civil Disorders, Report 164-165 (1968); President's Comm. on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society,* 103-106 (1967); *id., Task Force Report: The Police,* 13-41 (1967); Amsterdam, *The Supreme Court and the Rights of Suspects in Criminal Cases,* 45 NYU L Rev 785, 810 (1970); Caplan, *The Police Legal Advisor,* 58 J Crim LC & PS 303 (1967); Goldstein, *Police Policy Formulation: A Proposal for Improving Police Performance,* 65 Mich L Rev 1123 (1967). McGowan, *supra* at 664, note 8.

Since Judge McGowan's lecture, additional recommendations to the same effect have come in ABA Project on Standards for Criminal Justice, Standards Relating to the Urban Police Function, Part IV (final draft 1973); National Advisory Commission on Criminal Justice Standards and Goals, Report of Task Force on Police 21-28 (1973); and Oregon Law Enforcement Council, Proposed 1980 Standards and Goals for Oregon's Criminal Justice System 114 (third draft 1974). *See also* Amsterdam, *supra* note 8, at 378-380; K. C. Davis, Police Discretion, 98-120 (1975).

United States Attorney General Griffin Bell has favored the approach of general legislation and internal rule-making for the FBI:

A new charter for the FBI should also contain limitations and restrictions on the exercise of those duties to ensure that the mistakes of the past will not be repeated. It is important, however, that the drafting of restrictions to meet particular problems not evolve into the statutory enactment of an operating manual.

As this Committee is aware, the Department of Justice has promulgated various guidelines and policy statements governing the conduct of particular types of investigations and the use of certain sensitive investigative techniques. In addition, the FBI has its own comprehensive manual setting policy for investigative activities. These are very detailed in some respects and require case-by-case determinations to be made on the conduct of particular investigations. I do not dispute the desirability of exerting this type of control over FBI activities. I suggest, however, that it is a degree of control more appropriate to internal directives than to permanent legislation.

It is my view that legislation should establish the fundamental limitations which are to be applied, provide adequate legislative oversight, and fix executive responsibility. It should not attempt to dictate the day-to-day functioning of an executive agency with diverse responsibilities.

Department of Justice, Statement of Griffin B. Bell, Attorney General, before the Committee on the Judiciary, United States Senate, concerning FBI Charter Legislation, April 20, 1978.

Of course, neither statutes nor rules can circumvent constitutional limitations and neither contribute much if they are approached as an exercise in restating the existing case law applying those limitations.[13] That is little better than sending the police out with the latest United States Supreme Court advance sheets in their pockets, which is the effect of our present approach. What responsible legislative or executive rulemaking for searches and seizures can accomplish is to meet two important needs. It can define for the public and for law enforcement personnel who shall conduct a warrantless search or seizure, under what circumstances, for what purpose, and in what manner, as a general proposition in advance of a *fait accompli,* and in operational language rather than in the terms of constitutional law.[14] And officials

---

[13] *See* Israel, *Legislative Regulation of Searches and Seizures: The Michigan Proposals,* 73 Mich L Rev 222 (1974). Many of the extensive search and seizure provisons of the American Law Institute's Code of Pre-Arraignment Procedure, pp. 121-165 (1975), appear from the commentary to have been drafted as a "Restatement" of the Supreme Court's fourth amendment decisions.

Professor Amsterdam proposes the following constitutional requirement:

(1) Unless a search or seizure is conducted pursuant to and in conformity with either legislation or police departmental rules and regulations, it is an unreasonable search and seizure prohibited by the fourth amendment. (2) The legislation or police-made rules must be reasonably particular in setting forth the nature of the searches and seizures and the circumstances under which they should be made. (3) The legislation or rules must, of course, be conformable with all additional requirements imposed by the fourth amendment upon searches and seizures of the sorts that they authorize.

Amsterdam, *supra* note 8, at 416-417. Substituting Or Const art I, § 9, for "fourth amendment," this seems to me the proper use of the "law" postulated in Oregon's "No law . . ." phrasing of the constitutional guarantee.

[14] Besides the ALI's Code of Pre-Arraignment Procedure, *supra* note 13, drafts of rules can be found in International Association of Chiefs of Police, Criminal Justice Council of Texas, *Model Rules for Law Enforcement Officers;* College of Law, Arizona State University, and Police Foundation, *Project on Law Enforcement Policy and Rule-Making* (1974). An example of actual rules is an order establishing policy and procedures governing searches and inventories of vehicles issued by the Metropolitan Police Department of Washington, D.C., reprinted in the report on Police of

are more likely to consider these rules from a perspective that tests these directives by their potential use against every citizen and not only retrospectively by their use against a suspect actually put on trial. For it is not easy to frame directives that arrests, searches, or seizures shall be used against guilty persons but not against the innocent. Moreover, a statute or a rule can more readily be amended in the light of experience than a judicial ruling that is based on the constitution itself, and on facts that may not soon come before the court again.

### III

Although the criminal code does not directly cover many aspects of warrantless searches, it might perhaps be possible to derive the state's public policy from such provisions as do exist.[15] However, since the Court decides these cases in constitutional terms, it is important to note what it does decide.

*First,* the Court reaffirms that the two prohibitions of the constitutional guarantee—against "unreasonable search, or seizure" and against issuance of a warrant "but upon probable cause"—are read together, so that "searches conducted without a warrant are *per se* unreasonable, subject only to a few exceptions." *State v. Greene,* at 340-341. This means that a warrantless search or seizure must be justified

---

the National Advisory Commission on Criminal Justice Standards and Goals, *supra* note 12 at 589.

Similar official rules may in fact exist in some Oregon communities, but if so, they are never brought to this court's attention.

[15] For instance, the legislature has prescribed that in executing a search warrant, an officer shall read and give a copy of the warrant to the person who is to be searched or who is in charge of the premises, *i.e.,* inform the person of the object and permissible scope of the search. ORS 133.575. The scope of the search goes only so far as is "reasonably necessary" to discover the subjects within the granted authority to search, although other seizable items discovered within the scope of a valid search may be seized. ORS 133.585. ORS 133.535 prescribes what is subject to search and seizure under a warrant. These and other provisions could well be sources describing the state's policy also when exigency demands a search or seizure without a warrant.

first by some recognized rule of law under which action of that kind is not *per se* unreasonable, before reaching the question whether it was nevertheless unreasonable under the particular circumstances. That sequence of analysis is essential when one sees the function of the guarantee as a general regulation of governmental power and not only an ad hoc protection for individual persons. *See* Amsterdam, *Perspectives On The Fourth Amendment,* 58 Minn Law Rev 349, 367-369 (1974); Bacigal, *Some Observations and Proposals on the Nature of the Fourth Amendment,* 46 Geo Wash L Rev 529 (1978).

*Second,* the Court reaffirms that there is no general "automobile exception" to the constitutional guarantee. *State v. Fondren.* Except for authorized inspections concerning the vehicle itself, as a licensed and regulated piece of machinery, an automobile or other vehicle is certainly one of a person's "effects" secured against unreasonable search, or seizure. The need to seize or to search an automobile may often arise under the "exigent" circumstances that justify acting without a warrant, but exigency does not arise merely from the mobility of vehicles as a class. There must be actual exigent circumstances to justify a warrantless seizure or a warrantless search.

The Court thus does not accept the suggestion that automobiles are open to general police investigation because they are not a "protected area" nor give rise to a "legitimate expectation of privacy." The latter formula began as a "reasonable" expectation of privacy in Justice Harlan's individual opinion in *Katz v. United States,* 389 US 347, 360 (1967), a decision extending the fourth amendment to nontrespassory electronic eavesdropping, later becoming a "legitimate expectation" in *Couch v. United States,* 409 US 322, 336 (1973), and *United States v. Chadwick,* 433 US 1, 7 (1977). It is ironic to reverse the original extension in *Katz* in order to test people's expectations with respect to their "persons, houses, papers, and effects" which

[358]

the constitutional texts protect irrespective of expectation. If the emphasis is on the "legitimacy" of one's expectation of privacy, the test begs the question. If it focuses on the expectation as a social fact, people's actual experience with official practice produces a self-fulfilling prophecy.

This is particularly true of automobiles. I would assume, if it were necessary, that most Oregonians regard at least the trunks and glove compartments of their cars as private preserves, unless they have experienced otherwise. But, as the converted school bus in *State v. Downes* illustrates, the interiors of all vehicles cannot be thrown open to unwarranted search or seizure merely because they are mobile. Recently, Oregon motor vehicle registrations included 21,852 motor homes. Oregonians had 47,699 camper trucks. There were 91,583 registered house trailers. A recent addition is countless numbers of vans elaborately outfitted into private quarters with convertible beds, kitchens, music systems, and the like. If wheels alone established "exigent circumstances," the occupant who wants to turn away an officer without a warrant presumably should remove the wheels for the night.[16]

I agree with the majority in reaffirming the two foregoing propositions. I do not agree with the decision in *State v. Greene* in one respect. In my view, exigent reasons to seize upon probable cause without a war-

---

[16] It is not so clear what the occupants of the 204 "floating homes" and the thousands who occasionally spend a weekend aboard their motor or sailboats might do short of hauling them ashore. The backpacker's tent, presumably, is always mobile, so that it would never require a warrant to search.

A recent article in The Oregonian reported:

> The increasing number of boardings and confrontations involving fishermen and boat operators in Northwest waters has resulted in some nasty episodes and angry accusations of heavy-handed fascist tactics.

The Sunday Oregonian, *Northwest Magazine* 4-5, May 28, 1978. *See United States v. Piner,* 452 F Supp 1335 (1978) (suppressing marijuana found after boarding on a "random safety inspection" but without probable cause for a drug search and not in plain sight); *see also* Comment, *At Sea With the Fourth Amendment,* 32 U Miami L Rev 51 (1977).

rant and exigent reasons to search without a warrant are two separate issues. The constitution speaks of "search, or seizure" as distinct events. Although they generally follow one another, it is quite possible to have exigent reasons to dispense with a warrant for one but not for the other. Accordingly, if officers have secured possession of an automobile, a suitcase or some other container by a valid seizure, it does not follow that they may also proceed without a warrant to open and search the container or the trunk of the automobile without exigent reasons for a warrantless search. On this issue, I would not import *Chambers v. Maroney,* 399 US 42 (1970), into Oregon's article I, section 9. This is essentially the same reason that required the police to delay search of the briefcase in *State v. Groda,* 285 Or at 326-327, once it was secured.

Lent, J., joins in this specially concurring opinion.